SEYMOUR, Circuit Judge,
dissenting
I regret that I am unable to concur in either the legal or the factual analysis set out in the majority opinion. First, the majority applies a legal framework that in my view does not survive the Supreme Court’s recent decision in Crawford-El v. Britton, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998), in which the Court addressed the proper balance of the competing interests at stake when a defendant in a civil rights case raises the affirmative defense of qualified immunity. In Craw *1134 ford-El, the Court expressly ruled that “courts of appeals may [not] craft special procedural rules for such cases to protect public servants from the burdens of trial and discovery that may impair the performance of their official duties.” Id. at 577, 118 S.Ct. 1584. Because the pre-Craw-ford-El authority relied on by the majority undeniably does exactly that, it is no longer valid. Second, I am troubled by the majority’s treatment of the issue of reasonableness in an excessive force case as a purely legal issue amenable to resolution on summary judgment. Contrary to authority in this and other circuits, the majority believes the issue of reasonableness in the qualified immunity context should be treated differently than the law treats it otherwise. Finally, I cannot agree with the majority’s conclusion that the use of force in this case was reasonable as a matter of law. Accordingly, I respectfully dissent.
I
Legal Framework
While the majority does acknowledge that damage actions are an important remedy for those injured by the abuse of governmental authority, the majority’s analysis nonetheless values only the interest of the defendant in avoiding pretrial discovery. In Cmwford-El, however, the Court pointed out that its opinion in Harlow should not be read to eliminate the need to balance the interests of both the plaintiff and the defendant, emphasizing that “[i]n situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees,” and that “social costs” to the interest of a defendant public official in avoiding discovery therefore “do not necessarily justify serious limitations upon ‘the only realistic’ remedy for the violation of constitutional rights.” Id. at 591, 118 S.Ct. 1584 (citations omitted). The tenor of the majority’s discussion does not, in my judgment, reflect the balanced view required by the Court’s analysis. Significantly, the Court noted:
Discovery involving public officials is indeed one of the evils that Harlow aimed to address, but neither that opinion nor subsequent decisions create an immunity from all discovery. Harlow sought to protect officials from the costs of “broad-reaching” discovery, and we have since recognized that limited discovery may sometimes be necessary before the district court can resolve a motion for summary judgment based on qualified immunity.
Id. at 593 n. 14, 118 S.Ct. 1584 (citations omitted). To the extent the majority bases its elevation of the defendant’s interests over those of the plaintiff on the need to eliminate all discovery, it cannot be reconciled with the Court’s recognition that both interests are entitled to equal consideration in the balancing process.
The majority’s undue emphasis on the interest of the defendant distorts its discussion addressing appellate review of the denial of a summary judgment in the qualified immunity context. Because the majority’s approach runs contrary to the discussion in Crawford-El addressing the need to balance both interests, the majority justifies its reliance on circuit law predating Crawfordr-El by concluding that case is not implicated here. This assertion is flawed in two respects.
First, while the Court in Crawfordr-El struck down heightened pleading requirements in the context of civil rights cases alleging constitutional violations involving intent, nothing in its rationale for doing so is peculiar to that category of cases. To the contrary, the Court’s reasoning and ruling are framed in broad terms and by those terms are applicable to any requirement in a civil rights case that is outside *1135 the Federal Rules of Civil Procedure and that benefits a defendant at the expense of a plaintiff.
Second, I cannot agree with the assertion that Crawford-El is not implicated because we are dealing with the plaintiffs burden in responding to the assertion of qualified immunity rather than the plaintiffs burden to plead a constitutional claim initially. The defendant’s interests in avoiding the burdens of discovery and trial which the Supreme Court held were implicated in the pleading requirement at issue in Crawford-El are the very interests which justified the judicial creation of the doctrine of qualified immunity. In striking down the heightened pleading requirement at issue there, the Court pointed out, as I have noted, that Harlow itself does not provide precedent for the notion that the need to prevent discovery justifies placing “a thumb on the defendant’s side of the scales,” id. at 593,118 S.Ct. 1584 or changing “the burden of proof for an entire category of claims,” id. at 594, 118 S.Ct. 1584. The Court also pointed out that “[njeither the text of § 1983 or any other federal statute, nor the Federal Rules of Civil Procedure, provide any support for imposing the clear and convincing burden of proof on plaintiffs either at the summary judgment stage or in the trial itself.” Id. Finally, the Court stated that “[t]he unprecedented change made by the Court of Appeals in this case ... lacks any common-law pedigree and alters the cause of action itself in a way that undermines the very purpose of § 1983 — -to provide a remedy for the violation of constitutional rights.” Id. at 594-95, 118 S.Ct. 1584.
As the Supreme Court’s discussion reveals, our pre-Crawford-El cases increasing the plaintiffs evidentiary showing for summary judgment purposes once the defendant raises a qualified immunity defense are as lacking in precedential grounding or statutory authority as was the heightened pleading requirement in Crawford-El. As was true with the requirement addressed by the Court there, to the extent the “heavy two-part burden” upon which the majority bases its analysis is greater than the ordinary burden upon a non-movant in a summary judgment case, it is not justified by Harlow, any federal statute, the rules of civil procedure, or the common law. Moreover, it undermines the remedial purpose of section 1983. As the Court held analogously in Crawfordr-El, there is simply no authority for treating summary judgment in the qualified immunity context any differently than we treat it in any other case.
The Court did state that once a defendant makes a properly supported motion for summary judgment on qualified immunity grounds, the plaintiff must identify affirmative evidence from which a jury could find that the plaintiff has carried his burden of proof. See id. at 600, 118 S.Ct. 1584. However, this is the same burden that is imposed upon a plaintiff in any civil case in response to a defendant’s motion for summary judgment, and therefore does not support the notion that a plaintiff bears a heightened burden when the summary judgment motion invokes qualified immunity.
II
Reasonableness As a Matter of Law
“Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the ‘objective legal reasonableness’ of the action.” Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). “We analyze a § 1983 claim of excessive force by determining whether the officers’ actions were objectively reasonable in light *1136 of the surrounding facts and circumstances.” Allen v. Muskogee, 119 F.3d 837, 840 (10th Cir.1997) (citing Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Because of the similarity of standards, this court has recognized that in an excessive force case, the qualified immunity analysis is intertwined with the merits of the case, see infra at 1128-1129. The majority posits that because the material facts here are purportedly undisputed, a court may determine the objective reasonableness of the challenged conduct as a matter of law in order to promote the defendant’s interest in avoiding prolonged pretrial proceedings. In view of Crawfordr-El, however, the defendant’s interest cannot support the weight the majority places upon it. Moreover, I am deeply troubled by an analysis which removes an entire category of civil rights cases from the jury, and I question “to what extent questions of ‘reasonableness’ can be resolved on summary judgment.” Abraham v. Raso, 183 F.3d 279, 289 (3d Cir.1999). In my judgment, the majority’s position is contrary to excessive force cases in this and other circuits.
The majority characterizes the objective reasonableness inquiry as a legal issue notwithstanding Tenth Circuit jurisprudence recognizing the matter as primarily a fact issue to be decided by the jury. In Quezada v. County of Bernalillo, 944 F.2d 710, 715 (10th Cir.1991), we held that “whether the police used excessive force in a § 1983 case has always been seen as a factual inquiry best answered by the fact finder.”[1] We followed that admonition in Sevier v. City of Lawrence, 60 F.3d 695, 699-701 (10th Cir.1995) (holding, under Johnson v. Jones, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995), jurisdiction lacking over interlocutory appeal of qualified immunity issue in excessive force case, and noting “conflicting evidence as to whether the officers precipitated the use of deadly force by their own actions during the course of the encounter immediately prior to the shooting [of suicidal person].” Id. at 701). See also Allen v. Muskogee, 119 F.3d at 840 (same); Mick v. Brewer, 76 F.3d 1127, 1135-37 (10th Cir.1996) (holding law governing excessive force clearly established in 1992 and reversing grant of summary judgment on qualified immunity issue). While Quezada and Allen are summary judgment cases on the constitutional issue of excessive force rather than on the availability of qualified immunity, our cases have also made clear that, because both inquiries turn on objective reasonableness, the merits of an excessive force claim are intertwined with the qualified immunity issue and the queries therefore cannot be separated into two discussions.
[I]n excessive force claims asserted under the Fourth Amendment, the qualified immunity question is usually answered in the Fourth Amendment inquiry. This is because, in the excessive force context, the Fourth Amendment inquiry asks directly whether the police officer reasonably could have believed that the force was necessary under the circumstances.
Dixon v. Richer, 922 F.2d 1456, 1463 (10th Cir.1991) (footnotes omitted). Under our case law, therefore, the issue of the objective reasonableness of an officer for summary judgment purposes is the same whether or not the defendant has raised the affirmative defense of qualified immunity. Accordingly, Quezada and Allen govern our analysis here.
Courts in other circuits have also expressed concern over “to what extent *1137 questions of ‘reasonableness’ can be resolved on summary judgment.” Abraham, 183 F.3d at 289.
Reasonableness under the Fourth Amendment resembles tort law in its attention to how a specific, concrete circumstance should affect an officer’s judgment. This sensitivity to context suggests that regardless of whether objective reasonableness invokes a different and heightened standard from negligence, reasonableness under the Fourth Amendment should frequently remain a question for the jury. To put the matter more directly, since we lack a clearly defined rule for declaring when conduct is reasonable in a specific context, we rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of “reasonableness” is itself reasonable and widely shared.
Id. at 289-90; see also Katz v. United States, 194 F.3d 962, 970 n. 5 (9th Cir.1999) (in addressing qualified immunity defense, “[t]he question of the reasonableness of force is usually a question of fact for the jury”), cert, granted sub nom. Saucier v. Katz, — U.S. --, 121 S.Ct. 480, 148 L.Ed.2d 454 (2000).[2]
Likewise in McNair v. Coffey, 234 F.3d 352 (7th Cir.2000), petition for cert. filed, 69 U.S.L.W. 3631 (U.S. Mar. 8, 2001) (No. 00-1456), Judge Easterbrook, writing for the court, rejected the position the majority adopts and refused to hold in favor of a defendant in a close case, stating that
“[t]o say that a public official is not exposed to damages even when all legal issues were authoritatively resolved before the conduct occurred would be to make a substantial change in the scope of liability under 42 U.S.C. § 1983. [The defendant’s] argument for immunity in factually (as opposed to legally) close cases is fundamentally a request to increase the plaintiffs burden of proof— to insist that the plaintiff show a violation not by a preponderance of the evidence (where the plaintiff can win a close case) but by clear and convincing evidence (where all close cases go to the defendant), perhaps even proof beyond a reasonable doubt. Only then, the argument goes, can we be sure that the public official should have recognized the culpability of his conduct. Yet a § 1983 case is not a criminal prosecution, and the preponderance standard applies to civil claims of all sorts. It should not be changed covertly, through an immunity defense that imposes a heightened standard of proof.”
Id. at 355 (citations omitted) (emphasis added). Significantly, the court in McNair also stated:
Let us never forget that immunity in § 1983 cases is a judicial invention. Congress provided for liability in absolute terms. Public officials who violate the Constitution or laws must pay; immunity is anti-textual. The justification for immunity is that the scope of liability has grown like topsy since 1871, when § 1983 was enacted, and that to carry out what Congress must have meant a court may depart from what Congress said. That’s a treacherous path for any *1138 judge to take, though history may provide a map ... [However,] a general doctrine of official immunity, independent of legal uncertainty, is not only anti-textual but also anti-historical in fourth amendment cases.
Id. at 356.
Ill
Summary Judgment on this Record
Finally, I cannot join the result reached by the majority. It is undisputed that the law governing excessive force cases was clearly established at the time of the incident here. The majority holds that defendant police officers acted objectively reasonably as a matter of law when they commanded that plaintiff leave his house knowing he was suicidal and had been drinking. Importantly, plaintiff made clear on the telephone to Officer Bruning that he wanted to commit suicide, Aplt. App. at 151, and that he wanted the officers to shoot him, id. at 153.[3] In fact, the record reflects not only that plaintiff came to the door of his house saying “Shoot me, shoot me,” id., but that he also was saying “shoot me” as he walked out among the officers, id. at 112, 169, 179. He was very drunk, “staggering” and “weaving.” Id. at 114. Notwithstanding plaintiffs agitated and suicidal state, the officers’ knowledge that he wanted the police to shoot him, and their belief that he was holding a gun, one officer, instead of taking cover, attempted to sneak up behind plaintiff to knock him to the ground. The majority also holds reasonable as a matter of law the actions of another officer who released an attack dog on plaintiff while the first officer was attempting to sneak up on him. These facts, viewed most favorably to Mr. Medina, do not compel the conclusion that the actions of either officer, which in combination brought about the situation where deadly force was arguably necessary, were objectively reasonable as a matter of law.[4]
To support the existence of fact issues related to the conduct of the officers, plaintiff offered the affidavit of an exceptionally well-qualified police expert to counter the assertion that the conduct here was objectively reasonable. Because in my judgment that affidavit clearly raises fact questions going to whether it was reasonable for the officers to conduct themselves as they did, I quote substantial portions from it:
1. I am a police practices and tactics expert which includes crowd control, use of force, cleoresin capsicum (pepper spray), batons, arrest techniques, and policies and procedures ....
2. I am a former sworn police officer, deputy sheriff, and Staff Executive. As the Staff Executive for a medium-sized Massachusetts police department, I headed the Administrative Bureau in addition to directing Planning and Research. My responsibilities included the writing and implementing of policies and procedures, review of use-of-force *1139 complaints, discipline recommendations, plus other administrative duties.
3. Educationally, I was awarded an Associate Degree in Police Science and a Certifícate in Corrections from the Northern Virginia Community College; a Bachelor of Science Degree from the University of Baltimore; a Master of Science Degree in Public Relations from Boston University; a Master Degree in Business Administration from Babson College; a Ph.D. in Applied Management and Decision Sciences from Walden University, in addition to post-graduate study.
4. Vocationally, I am the Vice Chairman of the Defensive Tactics Institute, Inc. (DTI) which is a private criminal justice training firm. Established in 1979, I have taught criminal justice professionals across the United States, Canada, and England. Instructional topics included officer safety, ... use of force policies and procedures, ... arrest techniques, ... chemical aerosol sprays, defensive tactics, plus other less-than-lethal disciplines.
5. Additionally, I have authored more than 115 articles, newsletters, and/or handbooks,....
7.According to the Officer-Involved Shooting summary, it is my understanding that Officers Cram and Ellis were within 8 to 10 feet of Mr. Medina at the time of the shooting (Officer Involved Shooting, Thompson summary, p. 2). Officers Comte and Cirka were entering the street toward the subject (Ibid.). Unless there are exigent circumstances which demand that officers take unnecessary risks, officers are taught to remain behind cover and concealment. Cover is anything that will hide the officer and also stop bullets. Concealment is anything that will hide the officer, but will not stop bullets. In my professional opinion, there were no exigent circumstances in this incident, therefore, these officers should have remained behind cover and concealment and not have engaged Mr. Medina, until he had surrendered. This action is consistent with contemporary police training and identified literature on this subject.
8. In my professional opinion, the officers created a dangerous situation for themselves, and then used deadly force to extricate themselves from it. Because Officers Cram and Ellis were so close to Mr. Medina when the dog attacked him, it is reasonable for his arms and hands to flail in an effort to protect himself from the dog. A reasonable and well-trained officer would have expected this type of reaction from a person who is being attacked by a dog. Had the officers stayed behind cover, there would not have been the need to shoot Mr. Medina. The officer safety literature surfaces and officers are taught that they should remain behind cover and concealment where they are safer than to leave these areas creating a dangerous situation for themselves and others.
9. In my professional opinion, the officers failed to follow generally-accepted guidelines for the escalation of force. For example, the use of pepper spray was not attempted by the officers, and this option on the force continuum should have been used prior to shooting Mr. Medina. Effective pepper spray may have blinded Mr. Medina so that he could *1140 have been forced into submission without the use of deadly force.
10. The actions of Officers Cram and Bruning demonstrate the failure to follow generally-accepted and taught officer safety and use-of-force guidelines thus causing them to use force, which in my professional opinion, was excessive.
Aplt.App. at 138-142 (emphasis added). This expert opinion was rendered after reviewing all the materials proffered by defendants in support of the motions for summary judgment. The expert concluded: “It is my understanding that the depositions of the defendant officers are scheduled for mid-summer. In order to complete my opinions in this matter, I will need to read their depositions.” Id. at 142 (emphasis added).[5]
Rather than being conclusory, this affidavit constitutes probative evidence suggesting that contemporary police procedures were violated by defendant officers in this case, and that, at a minimum, the completion of scheduled discovery was necessary to resolve fact issues regarding whether the officers needlessly created exigent circumstances and should have been using other means to subdue this intoxicated and suicidal man. See, e.g., Allen, 119 F.3d at 842 (“Plaintiff relied principally on her expert witness, ... a former police officer and college professor and now a consultant on police and security matters”). See generally Fed.R.Evid. 704, 705; 29 Wright & Gold, Federal Practice & Procedure §§ 6284, 6294. As in Allen, the record in our case does not show that defendants challenged the qualifications of plaintiffs expert on police procedures and tactics.
In sum, I cannot agree with the assertion that the Supreme Court’s analysis in Crawford-El is not implicated in this case. In my view, our prior case law requiring a plaintiff to shoulder a “heavy two-part” burden once qualified immunity has been raised has been overruled by Crawford-El to the extent this burden exceeds that borne by any plaintiff responding to a summary judgment motion in a civil case. I cannot agree that a court can or should rule as a matter of law on every excessive force case. In my view we may only do so when reasonable minds could not differ on whether the use of force was objectively reasonable. I cannot agree that the circumstances here present an appropriate case for resolving the issue as a matter of law. I therefore dissent.

. We also held that excessive force cases, unlike First Amendment issues, do not fall into a class of cases where "a heightened standard of review is necessary.” Quezada, 944 F.2d at 716.

. In his statement, Officer Bruning said it "entered his mind that Mr. Medina might try to use the police to shoot him.” Aplt.App. at 152.

. In view of the undisputed facts here demonstrating that the events creating the alleged need to use deadly force were intimately and immediately connected to the use of that force, I see no need for the citations and gloss to Bella v. Chamberlain, 24 F.3d 1251, 1256 & n. 7 (10th Cir.1994), and Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir.1995). The statement by the majority appended to those cases that the primary focus of the inquiry should be on the exact moment at which the force was used cannot be reconciled with the Supreme Court’s directive to examine the totality of the circumstances, and in addition raises the unnecessary metaphysical problems discussed in Abraham v. Raso, 183 F.3d 279, 291-92 (3d Cir.1999).

. I am particularly troubled by the fact that the majority's decision preempts consideration of the depositions of defendant police officers. In his response to defendants' motions for summary judgment, plaintiff requested the district court to permit the depositions of the police officers to go forward if the court were inclined to grant the motion for summary judgment. Aplt.App. at 134-35. Because the district court held that summary judgment was not proper on the state of the record presented, further development of evidence in opposition to the motion for summary judgment was not necessary. The record reflects that the depositions of Officers Bruning and Cram had not yet been "cleared on all calendars,” id. at 135, and that the depositions of Chief Kramer and Officers Comte and Ellis were set for the next month. In my view, granting summary judgment for defendants on appeal is premature because it is based on the statements of officers made during the police department investigation which had not been subject to cross examination.